## Patrick McCall, Appt., *v.* John Rourke.

A bill alleging that defendant agreed to purchase real estate for the plaintiff, at a sheriff's sale, does not state facts which raise a trust of any kind. Fraud at the time of the sale or the payment of the purchase money is necessary in order to toll the statute of 1856.

(Argued October 10, 1887. Decided October 31, 1887.)

October Term, 1887, No. 195, W. D., before GORDON, Ch. J., PAXSON, STERRETT, GREEN, and WILLIAMS, JJ. Appeal by

NOTE.—For the creation of trusts by the purchase of land for another at sales, see note to Shallcross v. Mawhinney, *ante*, p. 142.

complainant from a decree of the Common Pleas of Cambria County dismissing a bill in equity seeking to compel defendant to surrender the possession of certain real estate, which it was alleged he had purchased for and on account of the complainant. Affirmed.

The bill states that the orator had been in possession of and the owner of a certain lot in Croyle township, Cambria county (describing it) under a deed dated June 27, 1872; that orator became indebted to Owen McCall in the sum of $173.85, interest and costs of No. 118, March Term, 1879; that upon execution on said judgment the said lot was sold to John Rourke, the respondent in this case, by the sheriff, for $172, and the sheriff's deed duly acknowledged in open court April 2, 1879; that when said property was sold by the sheriff to Rourke the orator was absent from the said county of Cambria, in the state of Kansas; that respondent is married to orator's sister and was attending to orator's business at the time of said sale by the sheriff to Rourke; that Rourke purchased said property for the orator and not for himself, and that the evidence thereof is both written and parol, *viz.,* correspondence showing the purpose of the purchase by Rourke from the sheriff, as well as the conversation when at South Fork between orator and respondent; that valuable improvements were erected thereon, to wit, a two-story dwelling house, fencing, etc., by orator before the purchase by Rourke, to the value of $600; that orator has tendered to the respondent the full amount, and over, due to respondent on a statement of account between them; and did demand a conveyance of the title so acquired by Rourke at the sheriff's sale— all of which was refused by Rourke, but that he refused and still doth refuse to render to orator an account, or to give him, your orator, possession of the said premises, but doth occupy and says he is determined to retain the same.

The bill prays that the respondent be compelled to surrender the possession of the premises and to account, and for general relief.

The answer denied that defendant purchased the land for the complainant, or that he was attending to the complainant's business at the time of the sale, etc.

The case was sent to a master, who took the evidence and reported that "the plaintiff, Patrick McCall, is entitled to a re-

conveyance of the property from the defendant, John Rourke, on payment to him of the sum of $107, the money he actually paid as purchase money on the property, with interest from March 1, 1879; the sum of $105, his indebtedness to John Rourke on account, with interest from March 1, 1879; and the sum of $26.20, amount of promissory note, Patrick McCall in favor John Rourke, with interest from April 18, 1878; that the plaintiff's bill should be sustained;" and suggested a form of decree accordingly.

The defendant filed exceptions to the report, which were overruled by the master, and the case thereupon came before the court, which rendered the following opinion, in which the facts are stated:

"This case comes before us upon the report of an examiner and master in chancery. The master has performed his labors so carefully and ably as to bring every question of fact and of law so fully before us as to render our labor comparatively easy; and, while we cannot assent to all the positions of the master, we commend his presentation of the law and the facts to the members of the profession, as raising, in a clear and forcible manner, every question.

"Patrick McCall, the plaintiff, was owner of a house and lot in the village of South Fork, Cambria county, in 1878. In the same year he left Pennsylvania for Kansas, where he remained some three years.

"Before he left, suit was instituted against him by one Owen McCall, upon which judgment was obtained July 15, 1878, for $121.46 and costs. Upon a writ of fi. fa. upon this judgment, the real estate was extended; and afterwards, upon a vend. exp., sold to John Rourke, the defendant, for $172, the amount of the execution, with interest and costs. A sheriff's deed to John Rourke, dated April 2, 1879, duly acknowledged, completed the legal title of the defendant.

"The plaintiff alleges that the facts connected with the purchase create a trust—that John Rourke is only a trustee for Patrick McCall—and prays for a decree to compel the alleged trustee to convey the legal title to Patrick McCall, the *cestui que trust*.

"The plaintiff's bill alleges that John Rourke 'was attending to your orator's business at the time of said sale by the sheriff to the said Rourke.'

"If this were so, it is clear that the legal title of John Rourke would inure to the benefit of Patrick McCall. An agent or attorney may not purchase the property of his principal, and any purchase so made would inure to the benefit of such principal. There is no evidence, however, of any such agency.

"The bill further asserts 'that said Rourke purchased said property for your orator and not for himself.' Upon this question of fact and the proof of tender, testimony has been taken and reported by the examiner, together with his conclusions as master, upon the facts and the law of the case.

"The master finds in accordance with the decisions, as matter of law, that a mere parol promise of a purchaser to hold the land for another, without more, does not create a trust enforceable in equity. Under the statute of frauds, more especially the act of 1856, in order to create a resulting trust one of two things must be shown: first, the purchase must be made with the funds of the alleged *cestui que trust;* or, second, there must be such fraud in procuring the legal title as to raise a resulting trust *ex maleficio.*

"First: [In the case before us the defendant purchased with his own money. It is true the judgment upon which the sale was effected was reduced by payments made by the present plaintiff, the then defendant; but these credits were unknown to the purchaser, who bid the full amount of the judgment; and in furnishing the receipts for $65, the amount of payments, the then defendant only reduced the judgment to the proper amount, in case of the purchaser, which created, at most, but a moral obligation of John Rourke to repay.] 4

"Second. But was the defendant, John Rourke, guilty of such conduct, or misconduct, as would create him a trustee *ex maleficio* for Patrick McCall? Let us see.

"The trust in such case must be co-ordinate with the title; in other words, the bad faith or fraud must be an element of the title. If there was no fraud or bad faith at, or connected with, the act of purchase, no subsequent act of the purchaser could produce it. Let us, then, in this light examine the facts connected with the purchase.

"Patrick McCall, the plaintiff, lived in Kansas and wrote to his brother, Philip McCall, shortly before the sale, as he swears: 'I was in correspondence with my brother Philip during my stay in Kansas. I learned through him that the prop-

erty was to be sold. I then wrote to him to buy the property and keep it for me until such time as I would want it, and I would never forget him for doing so. Philip's statement of what the last letter contained, as made in my presence and before the examiner, was correct and full to the best of my recollection, as to what it contained. ' Philip wrote to me after the sale and told me who bought the property.'

"This is his testimony bearing upon the question, and it will be seen that he authorizes no agent but Philip McCall, and no course but a sale and a purchase.

"Philip McCall testifies, after proving loss of letter of Patrick McCall: 'At the time I got the letter I read it. It stated for me to go to Sheriff Ryan and get him to knock down the property as cheap as possible, and for me to buy it in and keep it until such time as he could pay me. I went down to South Fork to John Rourke's. John Rourke is a brother-in-law of mine. We talked over the matter. I told him that I had a mind to pay that debt which was against Patrick McCall. He said I should not do it—to let it go to sale. I then told him if he wished, to keep it and get his account out of it. I do not remember the exact words used. However, he agreed to it—to keep the property until such time as he would get what he had against it out of it. He agreed to buy the property at the sale, and keep it until he would get his money out of it. He was to keep the property until such time as Patrick McCall would pay the debt and all that was against the property, including all he owed him, John Rourke.' Again he swears: 'I did not see John Rourke again to speak to him till the day of sale. Between the time when I had the conversation with John Rourke and the day of sale, to make the matter sure for Patrick I came down to Johnstown, went to a certain party, and made arrangement to borrow money, for fear of any objection at the sale, so as to have enough to secure it for Patrick, for it was all he had. The day of the sale I met Mr. Rourke in Johnstown at the depot. I asked him if he had money enough to pay on it. He said he thought he had. I said if he didn't have enough, I would walk up the railroad to where I could get enough to pay on it, to buy it. He said, "Never mind, I have enough." I told him I wanted it in hands so that when Patrick would pay all that was against it, he should get his property. He then said that was all right, when Patrick would pay him what was

against, or he had against him, he (Rourke) would give him,. Patrick McCall, back his property. This was all said in presence of three of us, *viz.,* John Rourke, Michael McCall, and myself.'

"Michael McCall testifies: 'John Rourke and Philip Mc-Call agreed to buy the property in for Patrick McCall. John Rourke bought the property. Philip McCall did the bidding.. John Rourke agreed that he would give the property back to Patrick McCall when he, Patrick McCall, came back and would pay him (Rourke) the money he had paid on it. Philip .Mc-Call asked Rourke if he had money enough to buy the property in, saying if he had not, he (Philip McCall) would get it from Joseph Wiss. John Rourke told him, to the best of my recollection, that he had money enough to pay what was against it.'

"Now, this is all the testimony of the plaintiff as to the facts occurring before and at the time of the purchase. And the defendant on oath denies everything alleged so far as any trust is concerned; while in his subsequent letters there is no acknowledgment such as would make him a trustee *ex maleficio.* We can find nothing in the testimony to impeach the defendant with fraud or bad faith in securing the legal title. He only met the agent twice, and each time the agent sought him, and not he the agent. The first time, agent tells him he has received a letter from the plaintiff and suggests a sale and purchase of the property for the plaintiff, or a payment of the judgment. The defendant suggests a sale, the only thing authorized in the letter of the plaintiff.

"The second meeting was on the day of sale, and he asks defendant if he has money enough to purchase. The defendant tells him he has, will transfer it to plaintiff when he is paid,. etc.

"Now, in all the plaintiff's testimony it nowhere appears that Rourke sought by any unfair means the title to this property. No doubt his main purpose was to secure his own $125, and that he then intended to reconvey to plaintiff. But the question is, Did he obtain the title by fraudulent means, such as to make a trustee *ex maleficio?* There is no evidence that he obtained the confidence of the plaintiff or of his agent by undue means, the approach being on the other side. Nor is there a scintilla of evidence that he, or anyone else in his interest,. sought to depreciate the price of the property in order to ac-

quire the title at less than its value. In short the sheriff's sale seems to be as fair as such sales usually are. And the mere fact that the property sold at less than its cash value would not, of itself, aid in creating a trust; and what else have we?

"The admissions of a defendant are always evidence against him; the only admissions claimed here are in alleged letters of defendant. Yet it is most unfortunate that some of the letters are lost, and parol testimony sandwiched between them. Nay, worse than that, portions of letters are lost, or not produced, and we are left to infer the balance of the letter from the portion produced.

"Philip McCall testifies, in his testimony in chief: 'In writing to Patrick I wrote him that property had been sold and to John Rourke—not a word about a trust.' And Patrick McCall testifies: 'Philip wrote to me after the sale and told me who bought the property.'

"Then comes this remarkable letter from Patrick McCall to Philip McCall:

"Hartford, March 25, 1879.
"Dear Brother:—

"I write to you those fiew lines in return for yours of Mrc. 7, and I am glad to reed of Rourke getting the house iff there is anything to bee maid on it let him have it in welcome and as for the receipts I wrote to Junction two weeks ago to the postmaster I sent money from there twist sow iff they are any good to you I will get them all for you and send them to in your next letter let me know how much the house went for and hoe all bid on it and was it cash down.

"April 12, he again writes:

"Dear Friend John:—

"I received your letter, etc.; and after speaking of the Owen McCall receipts he proceeds to say: 'I am well satisfied you have bought the house & keep it.'

"Now these letters were directly after the sale to Rourke. Ten days after the second one Rourke writes and speaks of McCall's receipts, and the payment for the property by himself; but not one word relating to a trust.

"Then follow letters or statements, one of which is admit-

ted to be only a portion of a letter—the other upon its face is clearly so. The production of a portion of a letter, without the whole, if receivable at all as evidence, is of a very suspicious character. The produced portion commences, 'Now I tell you what I will do;' what went before this is left to conjecture. In this paper Rourke states that he will take $275 for the house and half the lot, but it contains no reference to any trust or promise.

"The next portion of letter from Rourke says: 'I would like to have it settled on the 15th of April; if you wish to redeem it, you can have it. I have neither heart nor eye for it; I would wish you to be as smart as you can and get all things settled.' The first part of this letter is not produced, and what we have of it shows no evidence of a trust.

"Two years after the sale Patrick McCall returns, pays $100 to Rourke on the repurchase or redemption of the property; and, some time after, receives the same money back; and finally, some four years after the purchase by Rourke, the amount originally demanded is offered and refused by Rourke. Then counsel seems to have been consulted by both parties, and we have the case here.

"Now, it is fairly presumable that the first object of the defendant, in making the purchase, was to secure his own debt; and it is equally probable that he intended to reconvey to the plaintiff as soon as he should be indemnified. The evidence would show that he got the property at half its value, and that since the purchase the property has doubled in value.

"The statute of frauds and perjuries, including the act of 1856, has been and must be sustained in all its force and integrity by courts of justice. [The master in the present case properly enunciates the law; but, as it strikes us, gives undue weight to the evidence adduced by the plaintiff.]

"It must always be borne in mind the facts are not decided, as in ordinary jury trials, by the mere weight of the evidence. It must be 'clear, explicit, and unequivocal.' McGinity v. McGinity, 63 Pa. 38, and Nixon's Appeal, 63 Pa. 279; Lingenfelter v. Richey, 62 Pa. 123; Kistler's Appeal, 73 Pa. 399, and other cases.

"The mind of the chancellor must be fully satisfied before a decree can be made. On this subject, we refer without more

to the opinion of the supreme court in Moore v. Small, 19 Pa. 461.

"Upon the question of trust, Peebles v. Reading, 8 Serg. & R. 484, has always been a leading case; and although Judge Duncan's opinion in that case has not been approved as a whole, one portion having been reversed and another questioned, still, in the main, it stands as the leading authority upon the question of parol trusts. From that case down it would be only an affectation of research to quote the long array of authorities vindicating the main position of the leading case.

"We have been referred to the cases of Lippincott v. Whitman, 83 Pa. 244; Wolford v. Herrington, 86 Pa. 39; and Cowperthwaite v. First Nat. Bank, 102 Pa. 397, as sustaining the plaintiff's position.

"Let us briefly examine these cases:

"In Lippincott v. Whitman, the facts never reached the jury. The judgment was taken for want of a sufficient affidavit of defense. The defendant testified in her affidavit of defense that she had been ensnared into signing a mortgage which she would not have signed but for a parol promise of plaintiff, as to its terms, which he afterwards fraudulently repudiated. The court below rendered judgment against her for want of a sufficient affidavit. This the supreme court reversed; and if, on the new trial awarded her, evidence shall be 'clear, explicit, and unequivocal' as to the facts, she will of course prevail.

"In Wolford v. Herrington the action was brought by husband and wife in right of the wife, Rachael Wolford. She had a friend who would take the title and wait a year. Herrington interposed and offered to secure the property in writing and give her two years. The writing was drawn by his order. He was asked at the sale to sign it; he said: 'Wait till I bid it off, and then I will sign it.' When again asked to sign it he said: 'Wait till I get my deed—then I will sign it.' He afterwards refused. The court held this such a fraud as created a trust *ex maleficio*.

"In Cowperthwaite v. First Nat. Bank the case was tried upon an offer of testimony. The defendant proposed to show that she claimed a bona fide interest in the property; that the plaintiff's agent sought her and proposed to bid it off for her, to which she assented; that he induced others to refrain from bidding, whereby the title was secured to plaintiff at an enor-

mous sacrifice. The court held this to be a fraud upon the defendant, and created a trust *ex maleficio* in her favor.

"Now, these cases are all quite different from the one before us, and do not impinge on the general rule. The principles of the earlier cases remain in full force.

"[Thus we feel constrained to reverse the conclusions of the master upon the evidence, but in doing so shall, in this equitable proceeding, as nearly as we can, reach the ends of substantial justice. For the $65 paid in ease of the defendant on the purchase money, the plaintiff might have had his action for money had and received. As that would now be barred by the statute of limitations, we here insert it, and we shall so frame our decree.]"    6

Thereupon the following decree was entered:

"And now, September 7, 1885, this case having been fully argued, it is the judgment and decree of the court that the plaintiff's bill be dismissed, and that he pay the costs, including a fee of $100 to the master, excepting the sum of $90, which portion of the costs shall be paid by John Rourke, the defendant."

From this decree complainant appealed, assigning as error: (1) The action of the court in entering said decree; (2) in not entering the decree suggested by the master; (3) in dismissing the bill; and (4–6) the portions of the opinion inclosed in brackets and designated by exponents.

*William H. Sechler,* for appellant.—When one has a bona fide claim, whether it is valid or not, to certain land, and is induced to confide in the verbal promise of another to purchase the same for the benefit of the former at a sheriff's sale, and in pursuance of this arrangement allows him to become the holder of the legal title, a subsequent denial of such promise by the purchaser is such a fraud as will convert him into a trustee *ex maleficio.* Wolford v. Herrington, 86 Pa. 39; Beegle v. Wentz, 55 Pa. 369, 93 Am. Dec. 762; Boynton v. Housler, 73 Pa. 453.

The defendant testifies that Philip McCall was the agent of the plaintiff. An agreement entered into with the agent was as binding as if made with plaintiff in person. The contract by the defendant to take the title to the property as security for his money and his agreement to reconvey when paid is clearly and explicitly proved. "The act of March 21, 1772, for the prevention of frauds and perjuries does not prevent a declaration of trust by parol." 8 Serg. & R. 484.

In Beegle v. Wentz, 55 Pa. 374, 93 Am. Dec. 762, the opinion says: "In fact, two equitable principles entered into the transaction—first, the ownership of the land which is the equivalent of paying for it, . . . second, the absolute fraud which characterizes the nonfulfilment of the very inducement which led the owner to part with his estate."

In this case the defendant obtained possession of the plaintiff's property by agreeing to reconvey when certain moneys were paid to him, and, by thus representing, procured the aid of the plaintiff in paying the purchase money to Sheriff Ryan. See Wolford v. Herrington, 86 Pa. 43; Cowperthwaite v. First. Nat. Bank, 102 Pa. 397.

Before the master the plaintiff contended that the title obtained by the defendant was only a mortgage. Authorities were cited to this question.

To convert a deed absolute on its face to a mortgage the evidence must be clear and specific. This may be shown by oral testimony. Lance's Appeal, 112 Pa. 456, 4 Atl. 375; Hartley's Appeal, 103 Pa. 23.

That a sheriff's sale was used as a medium for effectuating the transaction is no obligation to its being held as a mortgage. Sweetzer's Appeal, 71 Pa. 264; Danzeisen's Appeal, 73 Pa. 65, and Boynton v. Housler, 73 Pa. 453; Heath's Appeal, 100 Pa. 1.

*Daniel McLaughlin* for appellee.

PER CURIAM:

A demurrer to the bill in this case would have been fatal to it, for there is not enough set forth therein to raise a resulting trust in favor of the plaintiff. An oral agreement to purchase for another at a bona fide sheriff's sale will not of itself raise a trust of any kind. Fraud at the time of the sale, or the payment of the purchase money, is necessary in order to toll the statute (the statute of 1856), neither of which appears to be alleged in the bill. The utmost that can be inferred from its language is that Rourke agreed to purchase the property for McCall, and afterwards refused to perform. This, however, on all authority is insufficient to create a resulting trust. As for the facts of the case, they have been so well disposed of in

the opinion of the learned judge of the court below as to render further comment by us unnecessary.

The judgment is affirmed.